**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-cr-417 (CKK)** |
| | : | |
| **EVAN TANGEMAN, also known as** | : | |
| **"E," "Tate," and "Evan | Exchanger"** | : | |
| | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

Defendant Evan Tangeman (hereinafter, "the defendant") was part of a conspiracy that took millions in cryptocurrency from innocent victims stolen and then laundered those victims' funds by converting their digital assets to fiat cash.  For his part, the defendant then used the laundered money to rent mansions in for his co-conspirators.  Defendant not only enabled his co-conspirators to dissipate millions in victim funds, but also benefited directly and indirectly from the thefts himself, including receiving exotic automobiles as compensation for his work and using commissions earned for laundering on luxury goods.  Finally, when the first members of the SE enterprise – co-defendants Malone Lam and Jeandiel Serrano – were arrested and the massive scale of their fraud revealed, it was the defendant who took it upon himself to direct co-defendant Tucker Desmond to destroy digital devices belonging to members of the enterprise.  For his conduct, the United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully asks this Court to impose a sentence of 70 months' incarceration, to be followed by 36 months of supervised release, along with the forfeiture of the aforementioned luxury goods to be further specified in a forthcoming proposed order of forfeiture.

**I.      FACTUAL AND PROCEDURAL HISTORY**

In April 2025, a federal grand jury empaneled in the District of Columbia, returned a multi-count indictment against the defendant and multiple, additional co-defendants, charging him, and

others with, Conspiracy to Participate in a Racketeer Influenced and Corrupt Organization, in violation of 18 USC § 1962(d) (Count One) and Conspiracy to Launder Monetary Instruments, in violation of 18 USC § 1956(h) (Count Three). The defendant was arrested on an arrest warrant stemming from that indictment on May 13, 2025 and later arraigned on the initial charges against him before this Court on May 19, 2025. On December 8, 2025, following the return of a Second Superseding Indictment, the Court re-arraigned the defendant on the same two counts, and then conducted a change-of-plea hearing based on a plea agreement reached between the defendant and the United States. *See* Dec. 8, 2025 Minute Entry. Pursuant to that agreement, the defendant agreed to plead guilty to Count One of the Second Superseding Indictment in exchange for the government dismissing Count 3 at sentencing, among other considerations. *See* ECF No. 258. In support of the guilty plea, the defendant agreed to and acknowledged the following factual proffer under oath:

> The Social Engineering Enterprise ("SE Enterprise") was made up of a group of individuals based in California, Connecticut, New York, Florida, and abroad. The SE Enterprise began on a date unknown but by no later than October of 2023 and continued through at least in or around March 2025. Members and associates of the SE enterprise served different roles and held different responsibilities. The roles included database hackers, organizers, target identifiers, callers, money launderers, and residential burglars targeting hardware virtual currency wallets. Tangeman was a money launderer with the SE Enterprise. The purposes of the SE Enterprise included, but were not limited to, stealing virtual currency from victims throughout the United States through fraudulent pretenses; disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques; and converting laundered virtual currency into fiat currency and wire transfers for use at nightclubs, for the purchase of exotic cars, jewelry, luxury handbags, clothing, private jet rentals, and rental mansions in Los Angeles, the Hamptons, and Miami.

> Members and associates of the SE Enterprise used stolen virtual currency to purchase, among other things, (1) nightclub services ranging up to $500,000 per evening, (2) luxury handbags valued in the tens of thousands of dollars which were given away at nightclub parties, (3) luxury watches valued between $100,000 up to over $500,000, (4) luxury clothing valued in the tens of thousands of dollars, (5)

rental homes in Los Angeles, the Hamptons, and Miami, (6) private jet rentals for travel, (7) a team of private security guards, and (8) a fleet of exotic cars, ranging in value from $100,000 up to $3,800,000.

Tangeman met the members of the SE Enterprise in late 2023 when SE Enterprise members Malone Lam, Jeandiel Serrano, Connor Flansburg and others arrived in Los Angeles and needed assistance in booking rental homes with stolen cryptocurrency. Tangeman and Money Exchanger- I arranged for an initial short-term Airbnb for the SE Enterprise members by receiving stolen cryptocurrency and working with a bulk-cash convertor in the Los Angeles area to obtain fiat cash for the home payment. Tangeman and Money Exchanger- I charged a fee for their services.

Tangeman knew that these members of the SE Enterprise were stealing cryptocurrency through social engineering schemes and that they had no legitimate employment. The SE Enterprise members remained in the Los Angeles area following the expiration of this initial rental term. The group soon began working directly with Tangeman to obtain large rental mansions throughout the Los Angeles area, paying Tangeman in stolen cryptocurrency. Tangeman converted the stolen cryptocurrency into fiat cash and worked with real estate agents in Los Angeles to procure large mansions for the SE Enterprise. He paid upfront security deposits and often the entire lease term, all in cash, for members of the enterprise.

Tangeman also ensured that the lease documents did not contain the true names of the members of the SE Enterprise. Tangeman used fake identification documents or stolen identity documents to complete the rental transactions to conceal the true owners of the homes. This was all done with the goal of concealing their identities. These members of the SE Enterprise were unemployed young men, often under 20 years old and they did not want to draw law enforcement attention for renting homes for $40,000 - $80,000 per month with no legitimate income. Some of these rental homes were valued, according to Zillow, between $4,000,000 up to nearly $9,000,000.

In an August 25, 2024 group text chain Tangeman worked through a substantial cash deposit on a home for Malone Lam. Tangeman, using the username "Tate" and discussed that he "need at least $500k m [right now] to give to the house owner . .is that doable." Lam asked where to send the crypto and Money Exchanger-I responded with his USDT (Teather) address. Money Exchanger-I instructed Lam and others to send $550,000 in cryptocurrency and he would deduct transactions from the total owed each time until they accumulated approximately $3,000,000, which was owed to the homeowner. Tangeman then told Lam that, "[t]he move in date all depends on how quickly i can get the usdt because i have to get it exchanged and wired over it all takes time ... the 500k is going to be dropped off tonight."

Lam then asked to tour the home and Tangeman told him that it wasn't a good idea because the realtor had listed a fake identity on the lease documents- to

conceal Lam's true ownership. Specifically, Tangeman stated, "for the house she [realtor] put a person that is 55 years old that is living there with his family... put it under**... so let me see about touring."

Tangeman also arranged for rental homes for the members of the SE Enterprise in Miami when the group moved to Miami in September 2025. Tangeman procured these homes through stolen cryptocurrency sent to him by Lam.  Following the September 18, 2024 search warrants at Malone Lam's two homes in Miami, Tangeman logged into the security camera system and took screenshots of FBI agents searching the homes.

Throughout the course of the conspiracy, Tangeman also provided crypto-to-cash money laundering services to members of the SE Enterprise. In July 2024, Tangeman helped Lam secure an additional rental home. Tangeman sent Lam a link to the home, followed by "u can move in right away to this one as[]well." Lam responded, "let's do it," and Tangeman replied "Trying to see who has cash atm be [Money Exchanger 1] doesn't do exchanges anymore." Tangeman followed up with "I'll call u in 5 talking to his new cash guy atm [at the moment]." Tangeman then requested $196,880 in USDT from Lam and requested that it be sent to his USDT address. Lam said he didn't have USDT and asked for an XMR (Monero) address. Tangeman shared his "cash guy's" XMR address and Lam sent the $196,880. Tangeman replied with "Waiting for cash atm ... Then going to give it to her."

While in Miami in September 2024, Tangeman provided fiat cash to the members of the SE Enterprise on numerous occasions, in exchange for stolen and laundered cryptocurrency.

Following Malone Lam's arrest in Miami on September 18, 2024, Tangeman instructed another member of the SE Enterprise to travel to Lam's Los Angeles homes, retrieve electronic devices, and destroy them. This member followed the directions and did in fact destroy the devices.  This was done to prevent their seizure by law enforcement and impair their integrity for trial.

As a member of the SE Enterprise, Tangeman agreed that members of the SE Enterprise would commit at least two racketeering acts as defined by Title 18, United States Code, Section 1961. Tangeman knew that he was engaging in financial transactions in excess of $10,000 which represented the proceeds of unlawful activity, that being the social engineering cryptocurrency thefts being executed by members of the SE Enterprise, to include Lam and others. He further knew that he was changing the cryptocurrency into fiat cash for the SE Enterprise members to disguise the nature, location, source, ownership, and control of the stolen cryptocurrency. Tangeman agrees that it was reasonably foreseeable to him that at least $3,500,000 would be laundered during the existence of the SE Enterprise.

*See* ECF No. 257.   As the signed statement of facts makes clear, the foregoing does not purport to include all the defendant's illegal conduct, nor is it an inclusive recitation of everything that the defendant heard, knew, or witnessed concerning the illegal activities committed by the defendant and others.  *Id.*   Rather it was merely intended to represent sufficient information for the Court to find a factual basis for accepting the defendant's guilty plea.  *Id.*

## II.    DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

### A.    Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See *United States v. Gall*, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>
>>> (i) issued by the Sentencing Commission ...; and

(ii) that, . . . are in effect on the date
the defendant is sentenced; ...

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission ... and

(B) that, . . . is in effect on the date the defendant is
sentenced.

(6) the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct; and

(7) the need to provide restitution to any victims of the offense.

With respect to the U.S. Sentencing Guidelines, while they are no longer binding, they should inform the Court's approach to fashioning a sentence that will effectuate the aforementioned goals in § 3353(a). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cano-Flores,* 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range"). While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence. 18 U.S.C. § 3553(a)(4).

B.    Application of the United States Sentencing Guidelines

Turning to § 3353(a)(4), upon reviewing the Pre-Sentence Investigation Report (hereinafter, "PSR"), the government agrees with the calculations of U.S. Probation Office for the District of Columbia regarding the defendant's Final Offense Level under the U.S. Sentencing

Guidelines (hereinafter, "Guidelines" or "USSG") as well as USPO's calculation of his criminal history.  As such, the parties agree about the ensuing USSG range.

### 1.    Offense Level

The relevant Guideline for § 1962(d) is USSG § 2E1.1, which calls for a Base Offense Level of the greater of 19 or base offense level for the underlying offense conduct.  *See* § 2E1.1. If there is more than one underlying offense, each underlying offense is to be treated as though it contains a separate count of conviction.  Here, as the PSR points out, the underlying offense in question as it pertains to the defendant is money laundering.  *See* PSR at ¶ 43.  The base offense level for money laundering is governed by § 2S1.1, which in turn provides that the base offense level is determined by adding +8 to the offense level corresponding to the value of the laundered funds as outlined in the Table under §2B I.  *Id.* at ¶ 45.  Here, the defendant has agreed that it was reasonably foreseeable to him that between $3,500,000 and $9,500,000 would be laundered, leading to a + 18 increase, resulting in a Base Offense Level of 26.  *Id.*  Given that the defendant was in the business of laundering money, there is a four-level increase in the base offense level under § 2S1.1(b)(2)(C).  *Id.* at ¶ 46.  In light of the defendant's conduct in directing co-defendant Desmond to destroy digital devices of co-conspirators after co-defendants Lam and Serrano were arrested, there is a two-level increase in offense level under § 3C1.1 for obstruction of justice.  *Id.* at ¶ 49.  Thus, the defendant's Adjusted Offense Level is 32.

The government agrees that the defendant clearly demonstrated acceptance of responsibility by pleading guilty, earning a two-level reduction from the Adjusted Offense Level under § 3E1.1.  *Id.* at ¶53.  In addition, because he assisted authorities in their investigation of his own conduct by pleading guilty as early as he did, he has earned an additional one-level reduction. *Id.* at ¶ 54.  Finally, the government agrees that the defendant meets the criteria at USSG

§§4C1.l(a)(1)-(11), reducing the defendant's Adjusted Offense level by an additional two levels. Therefore, his Final Offense Level is 27.

### 2. Criminal History

The defendant does not have any criminal convictions. His criminal history score is zero and his Criminal History Category ("CHC") is I.

### 3. USSG Range

At a Final Offense Level of 27, within CHC I, the resulting Guidelines range is 70-87 months' incarceration, in Zone D. In this zone, the Guidelines require a sentence of imprisonment only, with no provision for probationary sentences or carceral sentences in which periods of intermittent, home, or community confinement can be substituted for incarceration.

### C.   Allocution

The defendant's assistance in the laundering of millions of dollars in cryptocurrency enabled himself and his co-conspirators to live out a fantasy, replete with luxury automobiles, exclusive nightclubs, expensive trips to exotic locales, and high-end fashion. This life that the defendant helped build for himself and his co-conspirators was founded and sustained upon the misery of innocent victims who were defrauded out of their money. The defendant was well aware of where the funds he was laundering came from and did it anyway. The defendant did not offer his laundering services just once before recognizing the error of his ways, but did so repeatedly. Having immersed himself within the SE Enterprise's workings, the defendant followed his commitment to the conspiracy to its logical conclusion by directing another co-defendant to destroy incriminating evidence when the group's crimes came to light in September 2024. To accomplish the goals of § 3553(a), the government recommends a sentence of 70 months' incarceration followed by 36 months of supervised release.

### 1.    *Nature and Circumstances of the Offense*

The defendant conspired to launder millions of dollars on behalf a criminal enterprise that stole more than $250,000,000 from innocent victims throughout the United States.  Through his repeated criminal conduct, he effectively obfuscated the source of the stolen cryptocurrency that enabled his co-conspirators to at least temporarily evade detection from law enforcement and use victim funds to support their lavish lifestyles.  Consequently, as an initial matter, the severity of his offense weighs heavily in favor of the government's recommended sentence.

A more fulsome exploration of the defendant's crimes lends further support to the government's position.  Tangeman was introduced to the SE via Money Exchanger-I, who was providing crypto-to-cash services in which he would take the SE Enterprise's stolen cryptocurrency and convert it into fiat cash which the co-conspirators could then go dissipate.  Tangeman agreed to assist the group in procuring high-end rental homes typically worth between $40,000 to $80,000 per month.  He handled the submission of any paperwork to the homeowners, monthly rental payments, and the requisite cash conversions – all for a fee.  The homes that the defendant assisted in renting are below:



*First LA Rental from Tangeman for Serrano, Lam, and Flansburg ("4349")*



*Serrano's LA Rental from Tangeman ("The Hesby House")*



*Malone Lam LA rental from Tangeman ("The Mandalay House")*

The defendant arranged for the above three rental units for members of the group, all rented under fake identities and paid in cash, by virtue of he and Money Exchanger-I taking the stolen crypto and laundering it into fiat currency. Co-defendants Serrano, Flansburg and others paid rent at the Hesby House through the defendant. The home was rented under the name "Sean McGarry," with the below ID card.

10



The lease listed Sean McGarry, Maria Gonzales, Math Ghay, Joker Ayusn, and Garth Jackson as the tenants. McGarry, with the identifiers in this ID card, does not exist in any FBI systems. The defendant also provided $120,800 in cash as an upfront payment and security deposit and handled the monthly $30,000 rental bill. The defendant handled any concerns with the rental property like changing the door codes and also assisted in renewing the rental units as well.

The defendant also dealt directly with co-defendant Lam regarding his rental properties of choice. In addition to the text message conversation from August 2024 detailed in the Statement of Offense, the defendant had other exchanges with Lam. In July 2024, for example, in discussing the Mandalay home noted above, "u can move in right away to this one as[]well." Lam responded, "let's do it," and the defendant replied "Trying to see who has cash atm bc Money Exchanger-I doesn't do exchanges anymore." The defendant followed up with "I'll call u in 5 talking to his new cash guy atm [at the moment]" and then requested $196,880 in USDT from Lam and requested that it be sent to his USDT address. Lam said he didn't have USDT and asked for an XMR address. The defendant shared his "cash guy's" XMR address and Lam sent the $196,880. The defendant replied with "Waiting for cash atm…Then going to give it to her." This exchange over the Mandalay home was not a one-off. Rather, throughout that time period, the defendant discussed brokering crypto-to-cash transactions for Lam over the course of their conversations. On July 19, 2024, Lam requested $300,000 in cash and the defendant and Lam went back and forth as to

11

whether the transaction had to be in USDT, ETH, or XMR.  In another August 23, 2024 exchange, the defendant was helping Lam get yet another home, for over $300,000.  The defendant wrote "Need the money for the house right now trying to see how much exchange rate is give me 10. . . Normal exchanger not responding so getting charged 7% so total will be $337,050 For 6months move in Thursday."  The defendant confirmed he had USDT, causing the defendant to send him a USDT address, and after which co-defendant Lam sent the funds.

The conversations continued into September 2024 with other co-conspirators.  On September 13, 2024, co-defendant Serrano discussed wanting to find a new rental home when he returned from the Maldives and the defendant responded "[w]herever you want to move just come to me with the house u want i will get it for u or just tell me where u want to live and how long and how much and ill find something for u."  Co-defendant Serrano thanked him by saying "[y]our the fucking man too bro ik [I know] you can do it *you've done so much for our friend group time on and in.*"  (emphasis added).  Only five days after this exchange with co-defendant Serrano, the defendant yet again proved his worth to the SE Enterprise by directing co-defendant Desmond to destroy items with incriminating material on them.  As these acts and conversations demonstrate, the defendant was not a bit player within the SE Enterprise with limited insight into the group's activities.  Rather, he was a valued member of the conspiracy to whom co-conspirators would entrust with hundreds of thousands of dollars at a time.

The defendant also reaped the benefits of his criminal conduct.  Co-defendant Lam arranged for the purchase of a widebody Lamborghini Urus for the defendant, which the defendant subsequently revealed to other members of the conspiracy.  Furthermore, at the time of the execution of the search warrant on his residence, law enforcement identified and seized two

additional vehicles, including one black 2022 Rolls Royce Ghost, which is valued at more than $300,000.



*Photograph of garage of the defendant's residence*

The agents also identified and seized another white and black Porsche FT3, pictured below.



13

While in the house, agents found sundry luxury designer apparel, including $1,000+ men's goatskin sandals, watches, Louboutin heels, Louis Vuitton sneakers, and Chanel boots, among other things.







14

The defendant was unemployed at the time agents searched his residence and arrested him pursuant to the warrants, *see* PSR at ¶ 85, and, obviously, had to use victim funds to purchase these luxury items for himself and his girlfriend.  At this point, the idea that the defendant will be able to repay the various victims involved in this case – beyond whatever proceeds the government will realize from the forfeiture of the items seized from his residence – seems extraordinarily remote given his negative net worth and monthly cashflow, *see* PSR at ¶ 89.

In sum, the defendant facilitated the expenditure and dissipation of millions of dollars belonging to innocent victims, many of whom may never be made whole because much of the funds the defendant helped fritter away on extravagances, including the luxury rentals discussed above.

### 2.    *History and Characteristics*

A review of the defendant's personal history, as captured by the PSR, reveals no ready explanation as to why the defendant would have participated in the SE Enterprise as long as he did – but for, of course, greed.  While the defendant experienced some challenges in his early life, *see* PSR at ¶ 65, he had a loving caregiver in the form of his mother and noted that all of his material needs were met.  He graduated high school in 2022, *id.* at ¶ 82, where he was a good student, despite some learning difficulties.  The defendant then attended some college, *id.* at ¶ 83, before ultimately dropping out.  Since his arrest, he has been able to obtain full-time employment, *id.* at ¶ 86, and indicated that he is interested in earning a business degree and working as a real estate agent, *id.* at ¶ 88.  In short, the defendant had the benefits of a stable, if at times challenging, upbringing, a supportive parent who clearly cares for him, a high school degree, some college education, and, as demonstrated more recently, an ability to maintain employment.  As such, the defendant's participation in the SE Enterprise does not appear to have been borne of a troubled youth, emotional disturbance, or financial desperation of any sort.  The most cogent explanation,

rather, is that funds from SE Enterprise represented quick and easy money – albeit belonging to other people – that enabled the defendant and others to live a lifestyle that most men and women in their early twenties could only dream of.

        3.      *Need for the Sentence Imposed and Avoiding Unwarranted Sentencing Disparities*

The government believes that its proposed sentence will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with training, treatment, and other type of care he may require.  Only a Guidelines-compliant sentence of 70 months' incarceration would accomplish these goals.  The defendant was a vital member of a criminal enterprise that stole upwards of $250,000,000 from innocent victims across the country.  The members of the enterprise then used these stolen funds to live a life of unimaginable luxury at the expense of their victims.  The defendant enabled all of this by receiving cryptocurrency he knew to be stolen, converting it to cash, and then spending it on various things, including luxury home rentals.  Indeed, not only did the defendant's efforts obfuscate the source of the proceeds and allow the defendants to enjoy the fruits of their fraud, but by providing them with the rental homes in question, he allowed them to re-establish a homebase for further frauds.  Without the defendant – and other enablers like him – engaging in social engineering fraud would have been far less enticing given that those perpetrating the scams themselves would have been left holding on to illicit proceeds for prolonged periods of time and would have greater difficulty spending them.  All of these factors call for a particularly severe sentence to underscore how serious the offense is, provide just punishment, and promote respect for the law.  Such a sentence would also have an immense deterrent effect.  As

16

this Court has seen, the social engineering enterprise was sustained in part by a network of money launderers who could help those actually doing the scamming to realize the fruits of their fraud. A lengthy carceral sentence for a money launderer like the defendant would deter others from getting involved in such an enterprise, even if they were to be a level removed from the actual fraud itself and were merely laundering money for the enterprise. As such, the government's recommendation effectuates the purposes motivating § 3553(a)(2)(A)-(D).

The government respectfully disagrees with USPO's position, which calls for a 10-month variance from the bottom of the Guidelines. It appears that this recommendation is largely based on the defendant's relative youth at the time of the offense and lack of criminal history. The government believes that the defendant's relatively young age at the time of the offense is adequately captured as a mitigating factor by its recommendation of a bottom of the Guideline sentence. While perhaps some of the defendant's conduct can be explained away by the rashness and impulsiveness of youth and insufficient brain development, that explanation can only go so far. The defendant's criminal conduct was not the product of a momentary decision, rather, as the Guidelines stipulated upon make clear, he was in the business of laundering money and, as co-defendant Serrano's message to him makes clear, was a vital part of the enterprise. The defendant's participation in the conspiracy extended over a significant period of time and involved repeated transactions from individuals he knew to be engaged in criminal activity. While the defendant's age and lack of prior criminal history is pertinent, it does not warrant a 10-month downward variance.

4.      *Need to Avoid Unwarranted Sentencing Disparities.*

The government's recommendation does not create unwarranted sentencing disparities. The government concedes that the Judiciary Sentencing Information ("JSIN") data shows that for offenders sentenced under § 2S1.1, with a Final Offense Level of 27, in CHC I, they received

17

sentences containing an average length of imprisonment of 52 and a median length of 60 months, both of which are slightly lower than the government's proposal.  These benchmarks are roughly in line with the data from the U.S. Sentencing Commission for Fiscal Year 2024 for similar offenders (below):



Nevertheless, the government's recommendation follows the Guidelines.  This fact alone goes some way toward addressing any potential unwarranted disparities.  Indeed, twice in the past two years, the D.C. Circuit has emphasized that following the Guidelines is the best was to treat similar offenses and offenders similarly.  *See United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus, '[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (same).  *See also Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing.").  Furthermore, the government would argue that the defendant's conduct was worse than the average offender's given the scale of the enterprise he was involved in, the extent to which he personally benefitted from criminal proceeds, and his direction to others

in the enterprise to destroy evidence. For all these reasons, then, a bottom-of-the-Guidelines sentence does not create unwarranted disparities.

        D.      <u>Forfeiture and Restitution</u>

The government will be submitting a proposed Consent Order of Forfeiture to the Court. As the plea agreement contemplates, the proposed order will include the forfeiture of all items and automobiles seized from the defendant's residence on May 13, 2025. *See* ECF No. 258. In addition, it will also include all proceeds traceable to profits and commission fees earned from engaging in cryptocurrency transactions in funds generated through unlawful activity. *Id.*

With respect to restitution, the government will file a supplemental memorandum addressing this issue. The government would note that the Court has, under the Mandatory Victim Restitution Act of 1996, 90 days within the defendant's sentencing to make a final order as to restitution. 18 U.S.C. § 3664(d)(5). ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, . . . the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.")

## III.    CONCLUSION

WHEREFORE, the government respectfully requests that the Court sentence the defendant to 70 months' incarceration, to be followed by 36 months of supervised release.

                Respectfully submitted,

                JEANINE FERRIS PIRRO
                UNITED STATES ATTORNEY

                WILL HART
                Assistant United States Attorney
                U.S. Attorney's Office for the
                District of Columbia

D.C. Bar No. 1029325
601 D. St., N.W.,
Washington, D.C. 20530
William.hart@usdoj.gov
(202)-252-7877